**People of the State of Illinois, Defendant in Error, v. Maurice Pendleton, Plaintiff in Error.**

Gen. No. 50,932.

First District, Third Division.

September 29, 1966.

 

Herbert B. Nechin, of Chicago, for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Joel M. Flaum, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

The defendant, Maurice Pendleton, was found guilty of theft in a nonjury trial and was sentenced to serve a term of two to five years in the penitentiary.

The defendant contends that the State failed to prove that a theft was committed; that if a theft was committed the State did not prove the identity of the person who committed it; and that the State did not prove beyond a reasonable doubt that he participated in the alleged theft. He argues that all his actions can be explained on the theory of innocence and that his conduct after the supposed theft was especially inconsistent with guilt.

The State does not argue that the defendant himself committed the theft; rather, its position is that the evidence established that a theft was committed and that the defendant is legally accountable for the conduct of the actual thief. The State's position is based on section 5-2 of the Criminal Code of 1961, which provides:

"A person is legally accountable for the conduct of another when:

"(c) Either before or during the commission of an offense, and with the intent to promote or facilitate

315

such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill Rev Stats, c 38, § 5–2(c) (1963)).

The nature of the defendant's contentions, in conjunction with the circumstances of the alleged offense, requires that the evidence be set out in some detail.

The State's evidence was that in the afternoon of March 20, 1963, the defendant followed an unidentified woman into a grocery store at 13322 South Baltimore Avenue, Chicago. Two clerks, Ann Gleeson and Mary Petrungaro, were in the store, and a man who regularly delivered supplies was in and out of the store. The defendant and the woman, side by side and conversing, walked up and down the aisles and stopped at the meat case. The woman asked Mary for some spicy lunch meat; Mary replied there was none. The defendant and the woman were about to go out when Ann came from a back room with money in her hand. The woman then said to the defendant, "As long as we are here, honey, as long as we are here, why don't we get a few things?" The woman asked Mary to weigh several pounds of white potatoes. As Mary was doing that, Ann walked from the rear to a counter in the middle of the store. The woman asked Mary where the pop was, and she and the defendant went toward the back of the store to get a bottle. Mary waited at the front to check out the woman's purchases. About this time one of the store's regular customers came in, made a purchase and left.

Ann had been checking the delivery order when the defendant and the woman entered. About 5 minutes later she went to the back room to get money to pay the deliveryman. She got $416.02, and was counting it as she came from the back room. She saw the defendant and the woman near the front door and saw them turn toward the back of the store. She went to the counter where she had been checking the order and placed the

316

money on the counter beneath a book and order sheet. Shortly thereafter the defendant came up to Ann and asked for a soap which was specially effective in cleaning hands. Ann told him the soap display was farther down the aisle. The defendant asked her to show him where it was. They went a few feet away to the soap display. She took a bar of soap and came back to where the money was placed. The defendant asked her to read the soap label to him. She told him the soap was good for dirty hands, and said, "You can read it, sir, here it is." The defendant again asked her to read the label and she consented. While she read it to him her back was to the money. The defendant stood partially behind her, in a position to read the label with her. As she was reading someone whom she did not see pushed by. She turned to the counter where she had put the money, saw that the two pennies were on top of the book instead of underneath, picked up the book and discovered that the rest of the money was gone. She looked to the front of the store and saw the woman walking toward the door. As she was about to chase the woman the defendant asked her where the olives were. She said they were right there in front. The defendant took her by the arm and said, "You show me where they are at." She told him to release her and to get the olives himself, and she hurried to the front of the store shouting for Mary to stop the woman.

When the woman approached the front of the store she set a pop bottle on the counter and asked Mary to substitute red potatoes for the white ones. Mary went from the check-out counter to the other side of the store where the vegetable bins were. It was then that Ann shouted to stop the woman. Mary saw the woman walk quickly from the store and ran after her into the street, but lost sight of her.

The defendant followed Ann to the front of the store and at the check-out counter said he would buy the soap

317

and put a quarter on the counter. She said he would have to give her more money than that and demanded that he or his "girl friend" return the $416. He denied having the money and knowing the woman. She told him to wait till she called the police. He refused to stay and went to the doorway, but his exit was blocked by Mary who had returned to the store. The defendant pushed Mary and Ann told Mary to let him go and to call the police. She followed the defendant out of the store and down the street for half a block; he asked her how long she was going to follow him; she said she would continue until she knew where he was going or learned his license number. She saw the police car (which was responding to the telephone call), grabbed the defendant's arm and shouted to the policeman. She testified that the defendant then "looked at me and said 'You bitch, I'll go to jail for sure now.'" The officer stopped his car and arrested the defendant.

The defendant testified that he had been to the docks near 130th and Stony Island seeking employment as a waiter on a boat. There he was told workers were hired at a union hall. On his way to the union hall he got a flat tire. He changed the tire, dirtying his hands, and then drove to the first grocery store he saw to buy some soap to wash his hands. When he entered the store there were more than five people already there. He testified that the unidentified woman was in the store when he entered, that she was pretty and he flirted with her but that he was rebuffed and thereafter paid no attention to her as he proceeded to make his purchase. He stated that he asked Ann for soap which was not too strong, and that she showed him a bar and explained its qualities. He denied that he asked her to read the label to him. He testified that he asked her for olives but denied holding her by the arm and demanding to be shown where the olives were. He stated that after

318

he asked for the olives Ann walked up and down the aisles as if looking for something, that he went to the check-out counter to pay for the soap, that there she accused him and the woman of taking the money and that when he denied knowledge of the money and the woman she took a pistol from under the counter and made him empty his pockets. He convinced her that he did not have the money; she told him to wait till the woman was caught; he refused and she then said, "All right, we'll go out and look for the woman." He agreed and as they were walking a police car drove by; she seized his arm and shouted to the officer. The defendant denied calling her a "bitch" or saying that he would be going to jail.

 In a nonjury trial it is the responsibility of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. His judgment will not be overturned unless it is found to rest on doubtful, improbable, unsatisfactory or clearly insufficient evidence, so that a reasonable doubt of guilt is justified. People v. Boney, 28 Ill2d 505, 192 NE2d 920 (1963); People v. Finley, 22 Ill2d 525, 177 NE2d 149 (1961), cert den, 368 US 1003 (1962). The trial judge in the instant case decided that the defendant was not to be believed. A careful examination of the record convinces us that the court's appraisal of the defendant's credibility should not be set aside. The evidence presented by the State is not doubtful, improbable or clearly insufficient, and all reasonable inferences to be drawn from the evidence support the conclusion of the court that a theft was committed and that before and during the commission of the theft the defendant intentionally aided and abetted a confederate in the commission of the theft.

The testimony as to the manner in which the defendant accompanied the woman through the store and talked

with her justifies an inference that they had known each other before their meeting in the store; the inference is strengthened by the testimony that the woman called the defendant "honey." When Ann entered from the back room counting the money the defendant and the woman were near the front door but were turned toward the rear of the store; a reasonable inference from what they said is that they saw the money and decided to wait for an opportunity to steal it. The defendant got Ann away from the money by asking her to show him where the soap was; when she returned to the money he distracted her attention by asking her to read the soap label, and by standing between her and the money he shielded his accomplice. The trial judge could fairly infer that these things were done with the intent to promote the commission of the theft. Ann remained in the narrow aisle near the counter on which the money was placed from the time she put it there until the time she discovered it was missing. When someone squeezed by her and the defendant and aroused her suspicion, no one other than herself, Mary, the defendant, the woman, and possibly the deliveryman was in the store. The deliveryman came in and went out several times that afternoon; he reentered the store just after the defendant and Ann left. The trial judge could properly assume that he was not in the store during this period and could conclude, by elimination, that the money was stolen by the woman who had hurried from the store without finishing her shopping.

Nor is the evidence of the defendant's conduct after the theft compatible only with a hypothesis of innocence. When Ann discovered the theft and saw the woman hurriedly leave the store, she turned to pursue her and to summon aid. The defendant took her arm and told her to wait on him. A logical inference is that the defendant and the woman were acting in concert and that

the defendant was attempting to give the woman a few crucial moments in which to escape. Moreover, the defendant's statement to Ann just before his arrest indicates that he was aware of his guilt. That the defendant did not flee the store immediately, that he maintained his innocence under Ann's accusations, and that he accompanied her in what he characterized as a search for the woman are facts just as consistent with guilt as innocence: he did not have the stolen money in his possession; he would be able to, and did, convince Ann that he was not the thief, and by talking to her he was giving his accomplice time to get away. When he knew, by Mary's return that this was accomplished, he refused to await the arrival of the police and left immediately; and when Ann tagged along he showed his desire to be free of her by asking how long she was going to follow him.

■ The defendant was proved guilty beyond a reasonable doubt and the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.